Good morning, may it please the court. My name is Dan Poulsenberg and I, together with Heidi Perry Stern, I represent the appellants in this case. The critical issue that Judge Coyle decided is, under the General Mining Law of 1872, whether the possession of public lands by these miners was in good faith. And the judge decided that on summary judgment. When the government has the burden of proof by clear and convincing evidence. The essential argument is that this case, first of all, couldn't be decided on summary judgment. Second, it couldn't be decided on summary judgment in this record. And third, that the district court should have allowed a little more leniency, both in allowing the appellants to present evidence and in construing what they did present. Now, is good faith a term of art here? That is to say, if there is insufficient mining, doesn't that mean it's not in good faith? No. The term under Bagwell, United States v. Bagwell, this court looked at two points of analysis to determine good faith. And only one of the subparts was how much mining was done. What the court really needs to look to is the extent to which the site is used for purposes other than mining. And secondly, whether a prudent person would be justified in expending money and labor in developing either the mine or, in that case and in this case, a mill site. One of the factors is how much mining is being done. But it's not the critical factor. Okay. Let me come back to a more nuanced version of my question, helped by you. Isn't good faith a term of art for the existence or nonexistence of objective factors, the ones that you've just outlined? I would say it is more a conclusion. It is a term of art, but I'd say it's more of a conclusion that's drawn from the facts. And that's why I think summary judgment is... What I'm after is either on summary judgment or after trial, I think what the fact finder is being asked to decide when he or she is being asked to decide good faith is what factors exist on the ground from which I can determine. It's not a question of what's in this person's head. I'll agree with you to a point on that, yes. What the court needs to look to, it isn't somebody cannot come in, as Mr. Bagwell did in the Bagwell case, and say, no, I intend to use this mill site for milling purposes. I'm just not doing it. And in fact, in that case, he was actually using the property to raise livestock. Here, however... The physical existence of personal property or agricultural conduct or anything else, the physical presence on the property is certainly evidence that goes to the good faith question, right? I think it does, and I think the government... And there's a lot of junk on this property or personal property? There is some junk, yes. There is equipment that can be used for mining. And there's a growing orchard? There are plants up there. I think the connotation of an orchard is a little inaccurate. There were 90, and now there are roughly 38 plants, fruit trees, nectarines. Another part of cultural activity as opposed to mining activity. No, that's not being used to... It's not a commercial orchard. That's why I'm saying the word orchard is inappropriate. It was not used... About 97 percent of the fruit that was grown just was eaten by wildlife, natural to the area. And the others that were eaten were simply eaten on the property by the miners. There were no sales. This was not a commercial orchard. In fact, what Mr. Lau tried to explain when he did explain that is that he's a very holistic, he's a vegetarian, he believes that miners should give back to the earth. He thought that, first of all, the way the terraced orchard worked, it really filtered the water, which was able to be used for the mill. Secondly, he believed in giving back to the earth. He thought that this was a good thing to do for the property. Now, we could debate whether or not the government would agree with that, but it wasn't a separate commercial endeavor, such as the livestock in Bagwell. Third, he used it as a screen so that the operations wouldn't be seen from the road. He had a number of reasons for planting the trees. None of them would be something that I would say would be other than mining. And we could argue whether it's incidental to mining. The proof shows that it is. It's part of the process used to filter the water for the mill site. Could I sort of, you're partly answering the question I have in mind, but the court went through each of the Bagwell factors. And as I read Bagwell, the government prevails if it demonstrates either prong of the Bagwell analysis. That's true. So I went back trying to find out in your papers exactly which issues are in dispute. Where are the material issues in dispute under what the court analyzed? And I'm looking particularly at Excerpt 399 through 400, 401, I guess, where basically the court acknowledges at the beginning, and you mentioned this as well, that there's an issue of fact whether Mr. Calvo engaged in any mining at all. But in any event, with that then starts off and goes through the Bagwell analysis. And the Bagwell analysis seems to me to assume as a predicate that there is either some mining or perhaps no mining at the time of the analysis and focuses on what is the property being used for. So what are you saying are the factual issues and material factual issues that would defeat either prong of, or both prongs, I guess you have to defeat both prongs of the Bagwell analysis. Right. There is mining, there is some mining going on. But Bagwell assumes that there will be some. The question is whether the non-mining outweighs by some quantum of evidence. Well, in Bagwell, I agree. In Bagwell, actually, there was no mining going on. And that, I think, was a critical factor. Not to avoid your question, just a point I want to make about Bagwell is Bagwell was decided after a trial, not on summary judgment. So the question here is, and I think I'm getting to Judge Fletcher's question about a term of art, I don't think you just look at what is happening currently to determine whether or not there is enough mining there to show a subjective intent. I think under the two factors, I think the first Bagwell factor is a little subjective and the second one is clearly objective, whether anybody would mine there. But you look at the history of Mr. Lau on these sites. These claims go back to 1890 and his involvement goes back 50 years. He has been involved. He's done extensive mining on the property throughout the years. The only reason there was a decrease in the mining is because when the FLPMA was passed in the Locke v. United States situation, he was one of the many miners who filed on December 31st rather than prior to December 31st. So for a period of time, he lost his claim. He had to fight throughout the 80s. He had to fight claim jumpers. He had to, the BLM came in and bulldozed his cabin. First burned the cabin, then a year later bulldozed the foundation, destroyed his access road. Because of all these situations, what Mr. Lau is arguing is you have to look at the circumstances. He tried to get investors. He tried to do more mining. He named Mr. Leslie as one of the potential investors. He named a number of others. He was trying to do this. It was because of the three pieces of litigation here where he was not able to do more. Are you arguing that all the uses of this property are solely for prospecting, mining, or processing operations? Mr. Bollinger argues, yes, that all of his uses, clearly I think Mr. Lau's and Mr. Calvo's is. They are occasional occupants of the land, but only while they are mining or milling. The government claims that Mr. Bollinger is only mining for a short period of time, and he's living there all the time. So they think that his residential use exceeds what would be the ordinary... Exceed the residential use? I think at a trial... Is there anything in the affidavits that say it's not being used as a residence, or it's being used solely for the purposes described in 612? Well, Mr. Bollinger claims that his use is incidental because he is a caretaker and a guard, that his use is incidental to the property. But if this is a violation of 612, Judge Wiggins pointed that out in footnote 2 in Bagwell. He said a 612 violation does not constitute bad faith under the general mining law. It may be the basis for an injunction to limit the amount of use that the miners can make, but it cannot itself be the basis of injunction. So what I'm saying is I think that Judge Coyle painted with too broad a brush here in deciding on summary judgment that this was not good faith use. I think there are other remedies that may be available. I think some of the property can be removed. Some of it... My God, that should be removed. But not all of it. And some of Mr. Bollinger's residential use may or may not be incidental to mining operations. He says in his deposition that mining goes on all year. Now, they're claiming that it doesn't. That's a factual issue, and whether it's necessary for him to be on the site, especially with the history that Mr. Lau has had with claims jumpers, I think this is a reasonable... I think you cannot say on summary judgment that this is not a reasonable incidental use related to mining. I think at a trial perhaps we can cut down the use, but ejectment I think is the entirely wrong remedy. It's the same broad brush approach I think that also applies to the counterclaims, although I really am not as concerned about some of the counterclaims. Some of the counterclaims clearly do not state a claim. It's an interesting theory that BLM went to Congress to increase its powers, but it's certainly not a cause of action that one can state. But when Judge Coyle comes in and says, well, to the extent that the miners here are asking for damages in the 80s, it's barred by the statute of limitations, does not mean that all damages are barred by the statute of limitations. Again, a more carefully tailored remedy would resolve this. Can I address the issue of regulations? The government, as to Mr. Calvo, does not argue that he is doing insufficient mining or milling. That's right. Rather, it argues that Mr. Calvo has failed to comply with BLM regulations, and that is a sufficient ground to eject him. Can you respond to that argument? I don't think that it's a sufficient ground. For the same argument I talked about with I don't think it's a sufficient ground on this order for summary judgment. The order on summary judgment here simply says that there's no good faith mining attempt. There may, at trial, be a demonstration, and both Judge Coyle and the government in their appellate brief have been very conclusory about what the case is on the federal regulations. I don't think that the remedy here is the summary judgment ejectment order. Do you concede that if these regulations have been violated by Mr. Calvo, that that's ground for ejectment? I think it may be. It may be, but you're not sure you want to concede it? I know I don't want to concede it. Yeah, yeah. I'm trying to figure out whether we have a factual question or a legal question as to the violation on the regulations. I think that Judge Coyle, I think there's a factual question because Judge Coyle used the violation of the regulation to say that it was not good faith mining. I don't think that that's proper, and I think Judge Wiggins explained that. If the ejectment were going to be based solely on the regulations, that's a different issue, and I don't think that issue is presented by these orders or in the government's brief. Okay. And if there are no other questions, I would reserve the balance of my time for rebuttal. Thank you, Judge. Thank you. You're representing all three. Yes, I am. Yeah, thank you. Good morning, Your Honor. Linda Anderson, assistant U.S. attorney for the plaintiff Appley, United States. Analytically, the case fell in along two tracks. There was the case against Mr. Bollinger and Mr. Lowey that argued their occupation was, at least at this point in time, not in good faith, and then the case against Mr. Calvo, which argued that while he was doing some mining and the only mining equipment on the site that was being used was being used by him to lit a couple bathtubs, a couple of sluice boxes, cement mixers. Now, I looked at the pictures. They didn't look like bathtubs. They looked like tubs, but they didn't look like actual bathtubs. They're uninstalled bathtubs of the sort that you would install into a box in your home, so they're not finished. They're not like freestanding, like in a 1930s hotel. They're a bathtub that you would build into drywall and tile or any enclosure. Okay, so there's no dispute about it. I mean, I looked at the pictures, and they look bigger than a bathtub, even of the sort that you described. But if there's no dispute about whether they're bathtubs, I'm not going to get into it. They were described by the plaintiffs as bathtubs. And that leads to a critical part of our case here, Your Honor. We would not have sought summary judgment, we normally don't have the time to indulge in fantasies, if there really are tribal issues of fact. This was a case where virtually all of the disputed facts are disputed among the defendants themselves, and they were proved up in our motion based exclusively on the defendants' own descriptions, their own admissions, their own inform-a-pauperous applications. They may want to walk away from those inform-a-pauperous applications, but both Bollinger and Lowey swore to the court for some purpose that they wanted the court to rely on, that they didn't own anything of value, including even their mining claims. A significant issue here, too, is we've always maintained we aren't interested in keeping Mr. Bollinger, Calvo, or Lowey from mining. They can mine. We do not want to invalidate their claims or take them away. We just want the occupation to cease and the use to become exclusively mining on whatever scale they find appropriate. Mr. Calvo's other problem that he faces, he being the one who is doing mining, when he's in residence, he was not in residence between 97 and 99, and no mining happened. He came back in 99. He started up again. Are there other unexecuted judgments involving these matters? By the United States? Yes. No, Your Honor, I don't believe the United States owns any unexecuted judgments against any of the defendants. You've had no orders relating to use entered previously by a court? There are orders, Your Honor, but I believe they are entered against by other creditors of Mr. Lowey's, not the United States. And it was an execution of one of those, we believe, that caused the transfer of the really valuable claims there, the quote, specimen group claims, to a third party, Mr. Art Devine, in 1996, at which time investor Mr. Leslie walked away from it. Because what Mr. Lowey was left holding after 1996, when his judgment creditor obtained the unpatented mining claims of value, were two claims, the El Toyon and the Wheeler Gulch, that Mr. Calvo's deposition testimony was, had no value. The other way we know they have no value from this record is that Mr. Lowey maintained several times that one of the ways in which BLM interfered with his ability to mine was his loss of the specimen group claims in the early 80s. But his 1984 notice of intent said he was also going to mine El Toyon and Wheeler Gulch, which remained in his name accessible to him throughout the 80s, and yet he still did no mining. And again, Mr. Calvo's testimony is there's nothing there worth the time to dig out. So for those reasons, we sought summary judgment based on what the defendants themselves were saying. Now, in staying the order under the present case, was any bond posted or any financial arrangement? No, Your Honor. We did not ask for a bond. It's our – we are perfectly satisfied that both Mr. Lowey and Mr. Bollinger were fully frank with the Court when they submitted their inform-a-popers applications. Okay. And we – this is not an emergency situation. These gentlemen have resided, and this is no emergency. Twenty years. That's short time in mining. These gentlemen are very good at – they played the BLM along for a decade. Mr. Lowey talked me out of a year in answering the complaint in the first case we filed against him in 1994. They got three extensions – four extensions from the Court after the Court had said twice this is the last extension. They complain now they didn't get enough. I know, Your Honor. They got – they got – I believe it was their fourth request that was turned down. I will point out that Mr. Calvo did have a broken arm. He came to the oral argument on the summary judgment, and he had a broken arm. Mr. Bollinger did not show up at that argument without any communication to anyone. Mr. Lowey had applied to the Court to be excused from appearing at the argument, and that was granted. So at least Mr. Bollinger came one more time to Court. The judge asked him twice, Mr. Calvo, do you have permission to be on these claims? And Mr. Calvo acknowledged twice that he did not. And that would be the basis for our request that Mr. Calvo be ordered not to continue residing on the claim. Mr. Bollinger's occupation is clearly a sham. He's watching over stuff. Mr. Lowey says it has no value. He's watching over stuff that both Mr. Cal – Mr. Lowey and Mr. Bollinger – both Mr. Bollinger and Mr. Calvo in depositions testified has never been used in mining. Much of it's accumulated there for the purpose of building some kind of a dam, which we would be in here on an injunction action if something like that became real. Could you help me? You went past something that caught my attention, and that is you say that Mr. Calvo was asked twice, do you have permission. Could you elaborate that this – this must be in this record somewhere, but I don't know it. Do you have permission from whom to do what? From the Bureau of Land Management, which administers the land for the fee title holder of the United States. Particularly, my briefs had focused on the fact that Mr. Calvo hadn't sought permission under the 1996 promulgated regulations. Well, I see. This is the argument as to the regulations. Yes. Oh, I – I thought you were – this was going to be does he have permission from Mr. Lowey or from Mr. Bollinger. No, Your Honor. Okay. I'm with you then. Okay. That's – that was the gist of our argument. Mr. Lowey and Mr. Bollinger just don't have any business there at all. Mr. Calvo is mining, but – but he hasn't sought permission under the 3715 regs. Now, I have been lectured by a different panel of this court in other cases about judicial estoppel, and so we did put in our briefs here that if you look at what the requirements are to get residential occupancy under those regulations, Mr. Calvo's small-scale operation probably won't qualify. That's something he can shift around in the back of a truck and he can live in town or on a friend's ranch in the area and doesn't need to be a resident of the public lands. Therefore, he probably would not get permission under the regs for his current level of operation. So two-part question from me. One is, without being as elaborate, I was on the Court's ruling on summary judgment in Bagwell. There is the reference by the court, the district court, that there are factual issues and that the government concedes there are factual issues as to whether Calvo is actually engaged in mining. Now, today, you've come in and said, in fact, he is doing mining. Your Honor, we – in our – in our briefs, we never argued Mr. Calvo was not mining. I'm not quite sure what Judge Coyle was referencing there. Okay. So that's what I'd like some help on, because then Judge Calvo then goes on and goes through his application of the Bagwell factors. Now, you're saying that everything he cites in the little short statements on each of the factors is undisputed because it comes from the defendants? What Judge Coyle said about the Bagwell factors was supported in our record only by facts from the defendants' own admissions and depositions. We deduce no evidence from government employees about the level of mining out there. But did the – that's what you supported. Were any of those individual factors that he listed out and cited evidence to directly contradicted by the defendants in their opposition? Well, in the summary judgment, proceed. I have not reviewed that particular statement, Your Honor. So in any event, you don't have a recollection of it? No, Your Honor. The Bagwell factors, to answer the very first question the Court asked Mr. Poulsenberg, the Bagwell factors do seem to be objective factors, not subjective. How much mining has gone on? Has there been an effort to develop? And all of those things were answered out of the defendants' own references. Mr. Calvo said, yeah, all my tailings are there. You can see them, but you don't see much. Mr. Calvo says he fills, at the current time, is filling 10 or 12 bathtubs with tailings a year. Mr. Bollinger's estimate was that it was two or three bathtubs' worth of tailings in a year. They've been there for 20 years. There aren't the kinds of tailings that one might see at an active mill site where tons of ore was being processed. They're the only development, and this goes to their argument that somehow the BLM has interfered with their work there. Their 1984 proposed plan of operations, which is in the record, showed a lot of agriculture development, orchards, structures, a holding pond. All of those things are there, and they're shown in those photographs. What isn't there is evidence of any mining activity, a lot of tailings, a lot of ore, any record of significant income from the discovery of samples or ore from any of the claims. Mr. Calvo's operations for the last two years have been off someone else's claims, not Mr. Lowey's, because, again, since 1996, Mr. Lowey has not had possession of the specimen group claims where Mr. Calvo's working. Okay. Then the second part of my question comes back to the regulations, which you said with respect to Mr. Calvo would be a sufficient ground for summary judgment. I'm taking that as your point? Yes. We've sued Mr. Calvo basically under good old common law trespass. It's our land. He doesn't have permission to be doing his residential occupancy there. He has permission to prospect, and I take him at his word that he has permission from the current owner of the specimen group claims to prospect over there. That's not our fight. That owner would have the right to come into court on claims against Mr. Calvo if he either had never given permission or decided to revoke it. So you would just invoke the failure to get permission from BLM only against Mr. Calvo on this record? Well, Mr. Bollinger and Mr. Lowey also have not sought permission under those regulations. At least Mr. Bollinger would be able to. The regulations aren't available for someone who was already involved in a trespass case when they were promulgated, and that would keep Mr. Lowey from being able to seek permission under those regs right now. And the regulations, this whole argument was litigated fully in the district court? The argument about whether the regulations apply? In other words, if we were to say that the regulation, regardless of good faith, this case could be affirmed on the ground that the BLM regulation, a failure to seek permission would wipe all three claims out. Is the record sufficient for that? I would not say so because it isn't clear on this record that Mr. Lowey would be able to even try to apply for permission under 3715. He was already the subject of litigation about trespass from 1994 on, and the regulations preclude application to someone who's involved in an open trespass case already. But it would apply to both Bollinger and Calvo. It's the only reason for excluding Mr. Calvo from residential occupancy, not from mining. And it's one of two reasons for excluding Mr. Bollinger. The other is just Bagwell's bad faith because Mr. Bollinger's occupation is clearly a sham in light of Mr. Lowey's disavowal of owning anything of value and Mr. Bollinger's admission that he can't see the only claims Mr. Lowey still owns from the site. He says, I'm not sure this made it into the appeal record, he says that he drives by the claims on his way to get the mail in town. Well, under our 3715 regulations, that would mean he can live in town and go out and look at the claims, and he doesn't need to live on the land year round because twice a week he drives by and sees if anybody's been up there. So the BLM regulation, if that were a ground, that would keep him off the property but would not keep him from mining the property? It would keep him from living on the property other than within the 14-day per quarter camping limit that the BLM regulations afford anyone. The problem being that these gentlemen are, at least Mr. Bollinger, has been a permanent resident there from the 80s. Mr. Calvo is intermittent, but at the time of this lawsuit was in permanent residence there. Let me nail this down. I'm hearing this and I've read this, but I'm not sure I've got it completely understood. What is the extent of the remedy you are now seeking against each of these three defendants? Because I'm hearing you say, well, they can mine up there as long as they don't live there. Is that true for all of them? Could you go through each of the defendants and ask and tell me what precisely it is that you're now seeking from them? I know, for example, that you've dropped your damage claims because of, basically, a form of papyrus or insolvency or whatever. So just let me be sure I understand precisely what you're thinking here. Hopefully they are precisely enumerated in our writ of rejectment. But what we would like is for all three gentlemen to stop residing on the claims outside of the normal BLM camping limit, which is 14 days in a 90-day period. And we would like Mr. Lowy and Mr. Bollinger and Mr. Calvo, if he has any non-mining equipment there, to remove all of their personal property from the site. All of the personal non-mining property. No, I misspoke, Your Honor. All personal property to be removed from the site. Now, does that include personal property used for mining? Yes. Including those bathtubs? Yes. Well, how's he going to mine if he doesn't have his bathtubs? He puts them on the back of the flatbed truck he has, and he hauls them in when he's going to do his occasional rounds of mining. So he's got to pull it. In other words, you're asking him to remove the tailings, or do you want him to dump the tailings on the ground? You say they're full of them. When he's processing, our view is when he's processing, he drives his equipment in on his truck, sets it up for his two-week camping period, and operates it, or he removes to other places where he has lived intermittently during this case and sets up his operation in the backyard of whoever those people are and comes down to the site, takes his ore, his wheelbarrow of ore he's going to process that day, drives it back up to Mid Pines and processes it. Now, as I understand it from reading and from seeing the pictures, Mr. Calvo uses basically one of those old-fashioned cement mixers. You want him to put that on the back of the pickup, too? Yes. The bathtub, the sluice boxes, and the cement mixer will fit on the back of the flatbed truck that he has up there. That's a pretty big flatbed truck we're about to have here. No, I think it's a three-quarter ton. And how is he supposed to get that cement mixer down off the back of the truck? Is he supposed to load it and unload it every time? Your Honor, there's a lot of cement mixers floating around on the back of pickup trucks when workmen go to a house site to do a short-term job with cement, and they pick it up and put it on again. Okay, so I'm distracting you because you're asking them to remove all personal property, whether related to mining or not, okay? That is what we're seeking. That's Calvo, Lowry, and Bollinger, right? All three. Yes. And then because we believe much of that property has no value even to the defendants, as they've sworn it hasn't, we would like them, after they have a reasonable time to clear it out, permission, without violating their constitutional rights, to go in and remove the rest of it and dispose of it, to clean the site up. And that's what our writ of ejectment seeks. The only person actually residing there in any sense is Calvo? No, Mr. Bollinger resides there year-round. He's the quote watchman. And then Mr. Calvo has lived there intermittently. The last few things that I served Mr. Calvo in connection with this appeal prior to the appointment of counsel, when I started serving counsel, were all returned to me, no forwarding address. So Mr. Calvo had moved somewhere else, and I do not know where. But in your view, then, all three of these defendants can continue to mine, so long as they don't stay there or leave any of their personal property on the site? Beyond the 14-day camping limit. That is what we seek, Your Honor, yes. So they can sleep there 14 days out of the year as, quote, campers. Can they keep their property there, the personal property there during those 14 days? Can you take the cement mixer on for 14 days? Yeah, they could set up their operation for 14 days there on the site and leave it there overnight. For 14 days. For 14 days out of a 90-day period. It's 14 out of 90. It's not 14 per year. No, I believe under the current camping regulations, anyone can camp on BLM land for up to 14 days in any given 90-day period. So per year, it's four times 14. Yes, Your Honor. And is it only – the others may be overly sort of fastidious. Can they sort of accumulate and say, I haven't been there for a year, so I now have 56 days? That I don't know, Your Honor. I believe that's the purpose of the 90-day limit. I suppose they could come at the end of one 90-day cycle and – no, or does the cycle start – it's the 90 days from whenever they – it's not per quarter, in other words. That is a very lawyerly question. I don't know the answer as to whether you could come at the end and do it for a whole month. They could come the last 30 days, 14 days of one quarter, and then ask for the first 14. That would give them 28. I do not know. Can they take 14 days in succession on the same property? Yes. Within – within – So they can put stuff up there and transfer it one to the other, to the other, to the other. So there are three 14-day periods that the junk's up there, right, legally? I think I misheard your first question, Your Honor. What did you – You know, what creates a lot of problems, when you get an injunction like this, you've got to be very, very specific or you're going to have problems, especially with people that like continuances and design other methods to evade the order of the court. So – Your Honor, we have – the BLM has a purpose in the mining laws to facilitate the discovery of valuable minerals. And we don't – we have to honor that purpose as well. So we don't want to keep these gentlemen from doing any bona fide mining they might be inclined to do. We just don't want them to use the bad faith occupancy as a substitute residence into the indefinite future, as they have for the last 20 years. And that was the purpose. I agree it creates a certain amount of management headache. Does this land have rather temperate climate or is it wide swings? I mean, does it get heavy snows in the winter and runoff in the winter? There's a photograph of the general area of – I believe it's Hunter Valley. The land is posed above Reservoir Lake McClure. It's what you would call chaparral. There might be a few trees in some of the waterways, but it's mostly just what you would call scrub land. I think that it's hot in the summer. It's a little bit downhill from the city of Mariposa, so it's probably somewhat chilly in the winter, but it is not like high Sierras. There is a water source there, which is what spawned this encampment. There's a spring, and they have a mining claim over that spring, and they pipe the water in. So one can set up housekeeping there, and they have for 20 years. My time is up, Your Honors. One last question. I don't mean to detain you too long. I'm trying to figure out what, if anything, we should do with respect to the fact that Judge Coyle, in his order, did not base his order against Mr. Calvo on the failure to comply with the regulation. He based it on the failure to engage in good-faith mining. Is the question of regulation sort of properly fleshed out in front of us so that we can rely on, you know, affirm on any ground, even though it's not the judgment relied upon by the district judge? It was in our briefs, which are not in the record. And I do think that the Court's order does mention that Mr. Calvo didn't have permission. And if that derives from anything we briefed and argued, it would come from the regulations. Has there ever been an effort in this case to use the court, court of appeals, mediator service? No, Your Honor. Is the government opposed to it? Your Honor, as this record shows. In a specific order. That's what triggered my question. You're down to some very specific things like bathtubs and cement mixers and trucks and roads and the whole nine yards, residence and the definition of visitor periods. And, you know, it's not just a case of affirm or reverse or apply a statute. Somebody along the line is going to have to make very, very specific provisions in this case, if you're to prevail at all. If you get a general order, you don't have much to talk about. Well, what we have, Your Honor, is a writ of ejectment that just gets all of the property off after the plaintiffs have, the defendants have a chance to sort out what they want to keep. I have, we have not gone to mediation. I don't know if mediation was even proposed by the circuit. Sometimes the circuit selects cases. This record shows that these gentlemen had been sent by me four different settlement agreements they had solicited that were never responded to. We, at this point, perceive further settlement discussions as yet another delay. There still remains things to be worked out on the ground. I'm quite sure if the defendants needed 75 days to get their stuff off, the rangers would let them have another two weeks. That, and we come back to the fact that none of them has even applied, neither Bolliger nor Calvo, and once this case is over, Mr. Lowey would also be eligible to apply under the 3715s for residential occupancy, at which point they apply. The agency can differ with them about terms and conditions. If they can't work it out, we're back in court under an Administrative Procedure Act review on the failure to issue a permit or a permit with satisfactory conditions. I understand. Thank you, Your Honor. Thank you. Life goes on. Rebuttal. Thank you, Your Honor. Judge Fieser, I would welcome the opportunity to be able to have this in mediation. I think there are things, I think a lot of the trouble with this case is that there was a great deal of animosity and some of the things that these defendants said in the district court about the BLM and about Ms. Anderson personally. Counsel, before you agree to mediation, do you have such control over your clients that if the mediators requested the presence of all parties, we would be able to proceed on that basis? I would have to determine that, Your Honor. I think you would. I'm just exploring. Mr. Lowey is here present. I've had extensive communication with him. I understand. But I'm also aware of the record of what went on in the trial court in terms of continuances and who appears and when they appear. It appears to me it may create some very severe difficulties. I don't think that that is so much a control issue. I think that's more of a lack of familiarity. Minors are not lawyers. They live in a different world. They see the world differently. Mr. Bollinger and Mr. Calvo, one of their extensions, one of the problems they had was they had to read up to figure out what they were doing and that they didn't even know how to type. Lawyers aren't minors and they write the regulations. So it's a two-way street. I think if there were, and I cannot represent them in the district court. I'm not even licensed in that district. But I think that if they had a lawyer, a lot of these problems obviously wouldn't have happened. But I also think there would have been more cooperation between the two sides. And the animosity here, the conflict here gave off a lot of heat but little light. And I think that's what influenced Judge Coyle. You look at his order and he rejects our factual positions entirely. He says, no, we didn't do it properly. We didn't cite things. But you look at what the government filed. When they filed their statement of undisputed facts, they said, okay, here's our statement, here's a blank, put in your statement. Now, that looks surprisingly like an interrogatory, but our responses to those were rejected. Judge Coyle in end note says that we attempted to dispute them, but he discredited our positions. These were, in my opinion, there was enough record here that makes a question of fact. There clearly is enough to make a question of fact. They say that Mr. Bollinger's duties as a. . . Where would we find those? You may have cited them in your brief. But do you have a handy reference to where the Crawford response is? The excerpts, the supplemental excerpts, Mr. Bollinger's, they all appear in volume two of the supplemental excerpts. I have it in front of me. Do you want to just give me a sample? Yes, it would help if I had volume two. Okay. Take your time, you know. We're trying to figure this out. Well, some of them I'm willing to concede as to whether the United States has title to the property. But they go on, for example, at 240 where they're asked. . . What are you citing? I don't know. What are you citing, too? I'm looking at. . . So what I'm after here is, for example. . . Let me just turn. . . I'll do tab 210. And that would be Mr. Bollinger. That's it. And it's titled, Defendant Bollinger's Opposition Response to the United States Statement of Proposed Undisputed Facts in Support of Summary Judgment against Theodore Bollinger. And we've got what, about six pages, respectfully submitted, proof of service. And there's no. . . This is not an affidavit. There is no. . . And that. . . Exactly. Is that the problem? The problem is that the judge did not consider these to be affidavits or interrogatory responses. But they basically set out what each of the parties. . . There's a contention. There's a formal problem because there's not sworn and notarized. And that's one of our arguments, is that the judge didn't allow enough leniency for these minors in trying to represent themselves. Okay. I got it. Thank you, Your Honor. Counselor, are you appearing pro bono? Yes, Your Honor, I am. With or without compensation? I believe the government is going to pay my airfare. Okay. Well, I want to thank you very much for your service. Thank you, Your Honor. It's a voluntary thing, and you've got difficult people to deal with. And I appreciate your offer to mediate. I thank you. And if I can, I would pass your thanks on to Heidi as well, who did a lot of work on this case. Thank you both. Thank you. Thank both of you. The case was well argued on both sides. On both sides. No, I found the oral argument very helpful on a kind of tricky case in an area of law I won't speak for my colleagues, but an area of law with which, until this case, I was totally unfamiliar. The case of United States v. Lau is now submitted. The last case on the regular argument calendar is Pham v. Perhune. Do you need a break? No. We'll go straight. And after that, we'll hear from the lawyer in the Fernandez case. Thank you.
judges: Beezer, W. Fletcher, Fisher